UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

AVL POWERTRAIN ENGINEERING, INC.,
47519 Halyard Drive
Plymouth, MI 48170

Plaintiff,

v.

FAIRBANKS MORSE ENGINE,
a division of COLTEC INDUSTRIES, INC.,
5605 Carnegie Boulevard
Charlotte, NC 28209

Defendant.

Case No. 14-cv-877

**COMPLAINT AND JURY DEMAND**

---

**COMPLAINT AND JURY DEMAND**

Plaintiff, AVL POWERTRAIN ENGINEERING, INC. ("AVL"), by and through its attorneys, for its Complaint and Jury Demand against FAIRBANKS MORSE ENGINE, a division of COLTEC INDUSTRIES, INC. ("FME"), states as follows:

**COMPLAINT**

**INTRODUCTION**

1.  AVL seeks damages for FME's breach of a contract granting AVL exclusive use of FME's facility located at 701 White Avenue in Beloit, Wisconsin (the "Facility"), and related services by FME, in support of AVL's large engine testing operations. AVL also seeks damages for FME's breach of the implied covenant of good faith, independent of any breach of the contract's express terms. In the alternative, AVL seeks to rescind the contract and recover its reliance damages on the basis of fraudulent inducement and/or negligent misrepresentation, and/or recover for the benefits it conferred upon FME by which FME has been unjustly enriched.

{28053/60/DT912247.DOCX;1}     1

2. On behalf of its manufacturing customers AVL conducts environmental emissions and other testing of large engines such as those found in locomotives, ships, heavy construction equipment, and power plants. Although the testing is ultimately beneficial to the environment because it ensures compliance of the engines with emissions laws when placed into operation, the testing is itself subject to those laws. Accordingly, strict environmental compliance is critical to AVL's testing regimen.

3. As further explained below, AVL and FME entered into a contract that gave AVL exclusive use of the Facility for AVL's large engine testing operations, along with supporting services by FME. After entering into the contract, investing millions of dollars in development of the Facility for its purposes, and securing customer contracts, AVL learned that the emissions exhaust stacks assigned for AVL's use had been voluntarily de-commissioned by FME as part of its environmental permitting process years prior to the parties' contract. The de-commissioning of the stacks rendered the Facility and FME's services essentially useless for AVL's purposes, despite FME's representations to the contrary.

4. Despite AVL's repeated attempts to assist FME in finding alternative permitting solutions to mitigate FME's breach, FME ultimately refused to allow AVL to conduct further testing in the Facility or provide services incident thereto, and refused to seek the alternative permitting that may have allowed AVL to continue testing. FME's acts and omissions caused the loss or impairment of multiple AVL customer contracts, damage to AVL's relationships with its existing and prospective customers, and the loss of AVL's extensive investment in the Facility.

5. AVL never would have entered into the contract had it known the emissions stacks FME provided for AVL's testing had been de-commissioned and were therefore unusable.

But in the course of negotiations leading up to the contract, including in various spreadsheets representing the Facility's available emissions parameters, and ultimately in the contract itself, FME expressly misrepresented to AVL that FME and its Facility were fully compliant with applicable environmental law and suitable for AVL's purposes, and never disclosed its earlier, voluntary de-commissioning of the emissions stacks. Based on these misrepresentations and omissions, AVL entered into the contract, only to discover years later – after investing millions of dollars in the Facility with FME's encouragement and approval – that FME had grossly misrepresented and failed to accurately disclose its ability to comply with environmental laws in support of AVL's operations.

## PARTIES

6. Plaintiff AVL is a Michigan corporation with its principal place of business in Plymouth, Michigan.

7. Among other things, AVL tests and develops innovative powertrain systems, from diesel engines to electric drives. Specifically relevant to this dispute, on behalf of its large engine manufacturing customers AVL performs endurance and environmental emissions testing of large engines such as those found in locomotives, ships, heavy construction equipment, and power plants. This testing requires 24/7 operation of the engines over long periods of time in a controlled environment, on test stands connected to a dynomometer, a fuel source, a process water source (for cooling and dynomometer resistance), an exhaust stack, and other measuring equipment. Although the testing is ultimately beneficial to the environment because it is performed in part to ensure compliance with emissions laws when the engines are placed into operation, as a direct result of their size, power, and fuel consumption, the long-term testing of these engines has an appreciable impact on the environment. A facility with the necessary space,

fixtures, exhaust capability and environmental permitting is critical to the success of AVL's large engine testing contracts with its customers.

8. Defendant FME (Coltec Industries, Inc.) is a Pennsylvania corporation with its principal place of business in Charlotte, North Carolina. Through its Fairbanks Morse Engine division located in Beloit, Wisconsin, FME has historically manufactured large marine engines for the maritime industry and the United States Navy. At the time the parties entered into the 2008 contract at the center of this dispute, FME had significant unused space at the Facility and many of its engine test cells were dormant.

## JURISDICTION AND VENUE

9. Jurisdiction is proper in this Court under 28 U.S.C. §1332(a)(1). The amount in controversy exceeds $75,000.00, exclusive of interest and costs, and complete diversity of citizenship exists between plaintiff and defendant.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the event or omission giving rise to the claim occurred in this District.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

11. In 2008 AVL contracted with FME for the exclusive use of FME's Facility at 701 White Avenue in Beloit, Wisconsin for at least five years of large engine testing. FME further agreed to provide support services, including labor, set up, engineering and testing services. The August 28, 2008 Master Agreement between the parties is attached as Exhibit A ("Agreement").

12. Although Section 1.1 of the Agreement contemplated purchase orders for any services provided by FME in the course of the parties' relationship, in practice the parties never executed purchase orders. Rather, FME allowed AVL to build-out each cell to AVL's requirements, and then invoiced AVL and accepted AVL's payments for subsequent use of each

cell and any services provided by FME. By their course of performance the parties obviated the purchase order requirement.

13. Historically, FME had used the Facility for short-term, periodic production testing of marine engines, but it had largely gone dormant. The Facility had everything AVL needed, including – according to FME's representations – the necessary environmental permitting. As described in further detail below, by 2011 AVL had invested substantial sums of money building out four test cells in the Facility for its large engine testing program, and was actively serving multiple customers using those cells.

14. In late 2009, nonparty Caterpillar ("CAT") awarded its C175 large engine project to AVL, and in early 2010 AVL began construction of AVL Test Cell 31 ("TC31") in the "OP" Building of the Facility to support that contract, with the full knowledge and approval of FME.

15. In early 2010, CAT awarded its C280 large engine project to AVL, and AVL began construction of AVL Test Cell 32 ("TC32") to support that contract, with the full knowledge and approval of FME.

16. In January, 2011, CAT awarded its 3516 large engine project to AVL, and AVL began construction of AVL Test Cell 33 ("TC33") with the full knowledge and approval of FME.

17. In late 2010, AVL and nonparty Electro-Motive Diesel, Inc. ("EMD") began discussions regarding testing, and in December, 2010 AVL began construction of AVL Test Cell 34 ("TC34") for EMD testing.

18. By June, 2011, AVL was running tests at various times in all four of these test cells. FME knew of all of these AVL contracts and operations from inception through June, 2011, and never voiced any concerns regarding FME's compliance with environmental laws.

19. During its use of the Facility AVL assisted FME in pursuing additional / modified environmental permitting to allow increased use of the Facility, including expansion of AVL's testing operations beyond that being conducted in the initial four test cells in use by AVL. In the course of that effort, AVL learned through its environmental consultant that three of the Facility's exhaust stacks assigned by FME for AVL's use (stacks 21A, 21B, and 20C, assigned to TC33 and TC34) may have been voluntarily decommissioned as part of FME's 2005 permitting process – years before AVL contracted with FME. AVL was dependent upon these stacks for its engine testing program, and promptly brought this concern to FME's attention. FME had never disclosed the illegal status of these stacks.

20. In response to AVL's inquiry regarding the stack permitting status, on June 20, 2011 former FME President George Whittier sent a letter to Ray Corbin of AVL stating that the stacks serving TC33 and TC34 could no longer be used for engine testing because those stacks were "not described in FME's current Air Pollution Control Operation Permit, issued by the Wisconsin Department of Natural Resources (WDNR) on May 13, 2005." Exhibit B. Although Mr. Whittier's letter referenced only the stacks serving TC33 and TC34, the next day (June 21, 2011) FME shut down all of AVL's work in the Facility, including cells serviced by permitted stacks. FME accomplished this by, among other things, physically locking out the water flow to AVL equipment.

21. Although FME subsequently allowed limited use of TC33 by routing its exhaust through the permitted stack serving TC31, this shared use of a single stack inhibited AVL's fulfillment of its customer contracts. In particular, AVL was only able to complete about twenty percent of its testing on the CAT 3516 in TC33.

22. Similarly, although FME allowed interim use of a test cell in its separate "Assembly" Building for continuation of the EMD testing AVL had commenced in TC34, AVL had to essentially duplicate its earlier investment by also building out this new test cell. In July, 2012, FME notified AVL that no additional testing would be allowed in the Assembly Building after mid-October 2012. FME subsequently demanded that AVL vacate the Assembly Building by December, 2012.

23. FME also prevented any further use by AVL of TCs 31, 32, 33 and 34 in the OP Building, thereby eliminating AVL's ability to recoup its substantial investment in the Facility, complete the testing it had already undertaken for its customers, and accept additional large engine testing work during the balance of the Agreement's term.

24. Despite Mr. Whittier's statement in his June 20, 2011 letter that the de-commissioned stacks would be shut down only "until the Operation Permit is revised to include the referenced stacks," FME refused to cooperate in pursuing such revisions to the permit. Among other reasons for refusing to do so, FME feared reprisals for having assigned the illegal stacks for AVL's use.

25. There were multiple alternatives proffered by AVL that may have allowed AVL to continue testing in the Facility, by petitioning the Wisconsin Department of Natural Resources ("WDNR") for alternative approvals for increased emission of oxides of nitrogen ("NOx") (the primary component of engine emissions limited by environmental law). FME refused to pursue these alternatives.

26. The main reason for FME's refusal to pursue these permitting alternatives later became clear. Unbeknownst to AVL at the time, FME was negotiating with the United States government to minimize its penalties for unrelated environmental law violations, and AVL

became the sacrificial lamb in that effort. FME did not want to negotiate NOx *increases* in fulfillment of its contractual obligations to AVL, because FME was simultaneously – and voluntarily – offering to the government NOx *decreases* to minimize its exposure for unrelated environmental law violations.

27. In *United States of America v. Coltec Industries Inc. and National Steel and Shipbuilding Company*, Civil Action No. 1:10-cv-01659 (D.D.C.), the United States (on behalf of the EPA) filed a Complaint against Coltec Industries Inc. (more specifically, its FME division) and National Steel and Shipbuilding Company ("NASSCO") for violations of the Clean Air Act with respect to emissions certification and labeling requirements for new marine engines and vessels. FME had not properly certified or labeled 32 marine compression-ignition engines sold to NASSCO.

28. The principal violations alleged by the government against FME are not relevant to this action. But as part of its resolution of the government's claims through a Consent Decree, executed by FME on January 31, 2012, in order to reduce its penalty exposure FME volunteered that it would upgrade the NOx emission standards of the Facility at issue in this case. These upgrades had absolutely nothing to do with the government's claims against FME for improper certification and labeling of marine engines; rather, they were proffered by FME as a voluntary, supplemental offering designed to reduce FME's penalty exposure for the primary violation.

29. The Consent Decree is attached hereto as Exhibit C. At page 11, the Consent Decree describes the Supplemental Environmental Project ("SEP") FME agreed to undertake regarding reducing NOx emissions at the Facility by installing add-on pollution controls to exhaust stack S21F.

30. Satisfaction of the SEP required an 85% reduction in NOx emissions. Consent Decree, Section 13. Importantly, improvements (i.e., reductions in emissions) with respect to other test stands in the Facility could be used to compensate for the agreed emissions reductions to stack S21F. Consent Decree, Section 21, p. 15.

31. In Section 22 of the Consent Decree, FME further agreed *that it would not seek any increases to the existing fuel burn limitations*, as a result of the NOx decreases promised as part of the SEP. Accordingly, FME was not interested in seeking fuel burn or NOx emissions *increases* from WDNR to satisfy its contractual obligations to AVL, because it was simultaneously negotiating with the United States to *reduce* NOx emissions in order to minimize its own exposure for an unrelated violation.

32. In the Consent Decree FME represents that its cost to implement the SEP would be $500,000. Consent Decree, Section 15.a. FME further represented that the SEP was not required by any existing law, and would otherwise be *purely voluntary*:

> [A]s of the date of executing this Decree, Defendants are not required to perform or develop the SEP by any federal, state, or local law or regulation and are not required to perform or develop the SEP by agreement, grant, or as injunctive relief awarded in any other action in any forum.

Consent Decree, Section 15.b.

33. FME sacrificed its obligation of good faith and fair dealing owed to AVL in order to voluntarily reduce its penalty exposure for an unrelated environmental law violation. Because it was pursuing this deal with the government, FME never had any intention of revising its permitting to allow AVL to continue its testing regimen in the Facility.

34. AVL has searched for alternative locations to continue its testing programs for CAT and EMD, without success. CAT and EMD have since found alternative solutions for their large engine testing requirements that do not include AVL.

35. Through a recent review of WDNR records, AVL learned that FME in fact knew that Stacks 21A, 21B, and 20C had been voluntarily decommissioned as part of FME's 2005 permitting process – three years before FME assigned those very same stacks for AVL's use under the Agreement, while representing material compliance with all applicable environmental laws and regulations. FME's corporate representative Steve Mayse, then-Vice President-Operations, signed off on the 2005 permit application. Julie (Gilson) Mosley – the same representative present when AVL initially questioned the permitted status of the stacks in June, 2011 – was the FME environmental contact person copied on submission of the 2005 application.

36. FME's 2005 permit application confirms that it sought a permit contingent on "Removal of the P20 test stand identified as S20C, and removal of the P21 test stands identified as S21A, S21B, and S21C." As a result, FME's 2005 Air Operating Permit, as issued, excluded the stacks and explained in Footnote 22 that they would be removed from the Facility: "Four existing stacks (S20C, S21A, S21B and S21C) were not considered in the modeling because they are no longer being used, and are being removed from the facility. A new stack (S21F) was considered because it is part of the proposed modification. The limits are set at the maximum emissions rates determined by the computer model to protect the ambient air quality standard for PM emissions. It was determined that no increments or ambient air quality standards will be violated at these emission rates."

37. It turns out that FME's Mr. Whittier accurately described the decommissioned status of the stacks assigned to AVL in his June 20, 2011 letter to AVL's Mr. Corbin. The problem is that FME knew since 2005 that the stacks in question could not legally be used, but at the outset of the parties' relationship nevertheless misrepresented and failed to disclose to AVL

the stacks' true status and FME's lack of compliance with environmental laws, fraudulently inducing AVL to enter into the Agreement.

38. FME thereafter continued to invite AVL to invest in the facility, enter agreements with its customers, and build its business reputation in the large engine testing arena based on the false representation that AVL could legally operate in FME's Facility for five years.

## COUNT I

## BREACH OF CONTRACT

39. AVL incorporates the preceding paragraphs.

40. The Agreement obligated FME to provide test cell facilities to AVL for five years beginning August 28, 2008 (i.e., until August 28, 2013). Agreement, Exhibit A, Sections 1.1, 4.1.

41. The Agreement gave AVL "exclusive use of [FME's] test facilities located at 701 White Avenue in Beloit, Wisconsin," plus storage space for AVL customer engines and AVL parts and property. Agreement, Section 2.1. FME agreed that it would not allow the test facilities "to be used by any other party for any purpose without written consent of AVL." Agreement, Section 16.1.

42. The Agreement further obligated FME to provide services to AVL in support of AVL's engine testing operations, including support services for the test cells, operator labor, set up, engineering, and testing services. Agreement, Section 1.1. FME warranted that its services would be "carried out in a good and workmanlike manner…with all reasonable skill, care and diligence consistent with the standards of FME's industry…", and that FME personnel "possess the training, skills, competence and experience necessary to…safely and properly perform" the

services. Agreement, Section 6.1. FME further warranted that the services "shall conform to the specifications agreed to between the parties." Agreement, Section 6.2[sic].

43. FME represented to AVL that "with respect to the Test Facilities, FME is, and at all times has been, in material compliance with all applicable environmental laws and regulations." Agreement, Section 12.1. FME further agreed that "all activities and work performed … shall be carried out in accordance with all applicable laws, regulations and policies of the United States." Agreement, Section 14.1.

44. Although Section 1.1 of the Agreement contemplated purchase orders for any services provided by FME in the course of the parties' relationship, in practice the parties never executed purchase orders. Rather, FME allowed AVL to build-out each cell to AVL's requirements, and then invoiced AVL and accepted AVL's payments for subsequent use of each cell and any services provided by FME. By their course of performance the parties obviated the purchase order requirement.

45. FME's refusal to allow AVL's continued use of the Facility through August, 2013 was a material breach of the Agreement, including Sections 1.1 and 2.1.

46. FME materially breached at least Sections 1.1, 6.1, 6.2, 12.1 and 14.1 of the Agreement, because it knew at the time it entered into the Agreement (and at all times thereafter) that the stacks provided for AVL's use had been voluntarily decommissioned as part of FME's 2005 environmental permitting process, yet it assigned the non-permitted stacks to AVL for its testing operations, and its personnel assigned to provide the services were either unaware of the environmental restrictions on the Facility or failed to disclose them, rendering the services provided unsafe, improper, and not in compliance with the parties' Agreement.

47. AVL fully complied with its obligations under the Agreement.

48. FME's material breaches of the Agreement were an actual and proximate cause of injury and damage to AVL. As a result, AVL has suffered damages in at least the form of lost profits, lost or impaired customer relationships and expectancies, unrecoverable investment, damage to its reputation, incidental costs associated with the Agreement, and other amounts recoverable under the Agreement. AVL's damages exceed $75,000, exclusive of interest and costs.

## COUNT II

### BREACH OF THE IMPLIED DUTY OF GOOD FAITH

49. AVL incorporates the preceding paragraphs.

50. In addition to the express duties owed by FME to AVL under the Agreement, FME owed AVL the implied duty to act in good faith toward AVL and deal fairly with AVL when performing the expressed terms of the Agreement.

51. After signing the Agreement, when FME was approached by AVL regarding construction of TC31, TC32, TC33 and TC34, FME did not disclose the true permitting status of the Facility.

52. FME's failure to disclose the true permitting status of the Facility was a material breach of its duty of good faith and fair dealing under the Agreement.

53. Moreover, after finally informing AVL of that status, rather than seeking revised emissions increases that may have allowed AVL to continue its large engine testing program in the Facility after AVL discovered the illegal status of the exhaust stacks, FME instead secretly negotiated a voluntary deal with the government to significantly reduce emissions at the Facility, essentially making it impossible for AVL to continue using the Facility for its purposes.

54. FME's secret, voluntary action in favor of its own interests, to the detriment of AVL, materially breached FME's duty of good faith and fair dealing arising from the Agreement.

55. FME's material breaches of the covenant of good faith, independent of any breach of the express terms of the Agreement, was an actual and proximate cause of injury and damage to AVL. As a result, AVL has suffered damages in at least the form of lost profits, lost or impaired customer relationships and expectancies, unrecoverable investment, damage to its reputation, incidental costs associated with the Agreement and other amounts recoverable under the Agreement. AVL's damages exceed $75,000, exclusive of interest and costs.

## COUNT III

## FRAUDULENT INDUCEMENT / RESCISSION

56. AVL incorporates the preceding paragraphs.

57. As discussed, through a recent review of WDNR records, AVL learned that FME knew that Stacks 21A, 21B, and 20C had been decommissioned as part of FME's 2005 permitting process – indeed, that FME had specifically and voluntarily decommissioned those stacks – three years before FME contracted with AVL and assigned those stacks for AVL's use.

58. Accordingly, FME's representations that it was in compliance with applicable environmental law were knowingly or recklessly false. Not only was the same FME environmental compliance leader involved in the 2005 permit application (Julie (Gilson) Mosley) on FME's staff throughout the relationship with AVL, including when FME shut down AVL's testing, but FME even affirmatively renewed the 2005 permit prior to its May 13, 2010 expiration date – right in the middle of its relationship with AVL, but before FME invoked the permit as the reason for shutting down AVL operations.

59. FME was in the business of putting engine exhaust into the atmosphere, it had a full-time environmental staff and regularly engaged environmental counsel, and the permit governed FME's daily operations. The permit was not a document unknown to FME upon which an excusable mistake might be based.

60. Moreover, when confronted with the absence of legal stack permitting, rather than work with AVL to achieve permission from WDNR that may have allowed continued AVL testing, FME refused to approach WDNR and instead shut down all AVL operations.

61. Even without FME's express misrepresentations in the Agreement that FME had been and would remain in compliance with all applicable laws, FME's pre-contractual representations regarding its environmental compliance were egregious misrepresentations that induced AVL to enter into the arrangement, invest significant sums of money, and put its reputation on the line with its customers.

62. FME encouraged, contracted with, and accepted payment from AVL with respect to use of these stacks, never disclosing the fact that they could not legally be used. Only after AVL questioned the permitted status of the stacks did FME take action, using what FME had known for more than five years as justification for initially locking AVL out and then effectively terminating its further use of the Facility.

63. As a result of FME's intentional and/or reckless misrepresentations, AVL was fraudulently induced to enter into the Agreement and invest significant sums of money in the build-out of the test cells, in securing customer contracts, and in otherwise preparing to test engines at the Facility for its customers.

64. AVL believed and reasonably relied on FME's misrepresentations by entering into the Agreement and thereafter securing customer contracts and investing in the Facility.

65. Accordingly, as an additional remedy to its breach of contract claim, AVL is entitled to rescind the Agreement in its entirety and recover its reliance damages, including but not limited to its investment in the Facility and its expenses and other incidental costs in connection with the Agreement.

66. FME's motives of self interest in this case to the detriment of AVL show that actions were taken in an intentional disregard of the rights of AVL, rendering this a proper case for the award of punitive damages.

67. AVL's reliance damages exceed $75,000, and AVL also seeks punitive damages in an amount to be determined by the Jury.

## COUNT IV

### NEGLIGENT MISREPRESENTATION BY OMISSION / RESCISSION

68. AVL incorporates the preceding paragraphs.

69. Appropriate environmental permitting was material to the Agreement.

70. FME had peculiar and exclusive knowledge of the lack of appropriate permitting.

71. FME knew AVL was unaware that the Facility lacked the proper permitting.

72. Under these circumstances, AVL would reasonably expect disclosure by FME of the permitting status.

73. As discussed, FME did not disclose the true permitting status of the Facility at that time of the Agreement.

74. On or around the times noted above AVL gave notice of its plans for TC31, TC32, TC33 and TC34 to FME.

75. At none of those times did FME disclose to AVL the permitting status of the stacks related to TC31, TC32, TC33 or TC34 under circumstances in which AVL would have reasonably expected such disclosure.

76. Thereafter, AVL spent significant sums of money to perform construction on TC31, TC32, TC33 and TC34.

77. Thereafter, FME invoiced AVL for services and the use of TC31, TC32, T33 and TC34.

78. Thereafter, AVL timely paid those invoices

79. FME's omissions in this regard were at least negligent.

80. AVL reasonably relied on FME's omissions, and was thereby induced to enter into the Agreement and invest significant sums of money in the build-out of the test cells, in securing customer contracts, and in otherwise preparing to test engines at the Facility for its customers.

81. Accordingly, as an additional remedy to its breach of contract claim, AVL is entitled to rescind the Agreement in its entirety and recover its reliance damages, including but not limited to its investment in the Facility and its expenses and other incidental costs in connection with the Agreement.

82. AVL's reliance damages exceed $75,000, and AVL also seeks damages in an amount to be determined by the Jury.

## COUNT V

## UNJUST ENRICHMENT

83. AVL incorporates the preceding paragraphs.

84. Through its investments in the improvement of the Facility and its test cells, AVL has conferred a substantial benefit upon FME.

85. FME's retention of that benefit without payment to AVL would be unjust and inequitable.

86. The value of the benefit conferred upon FME by AVL exceeds $75,000.

WHEREFORE, AVL demands judgment as follows:

A. That FME materially breached the Agreement and/or the implied duty of good faith and fair dealing arising therefrom, entitling AVL to recover compensatory and contractual damages (including reasonable attorney and expert fees) to full extent available under the Agreement.

B. That FME fraudulently induced AVL to enter into the Agreement, entitling AVL to rescind the Agreement and recover its reliance damages as well as punitive damages.

C. That FME negligently induced AVL to enter into the Agreement, entitling AVL to rescind the Agreement and recover its reliance damages.

D. An award of damages in favor of AVL in excess of $75,000.

E. An award of punitive damages in an amount to be determined by the jury.

F. An award of AVL's costs and attorney fees in prosecuting this action.

G. An award of such other relief as the Court deems just and equitable.

## JURY DEMAND

AVL hereby demands a trial by jury on all issues so triable.

Respectfully submitted December 17, 2014.

                                        **KERR, RUSSELL AND WEBER, PLC**
Fred K. Herrmann (MI Bar P49519)
Matthew L. Powell (MI Bar P69186)
500 Woodward Avenue, Suite 2500
Detroit, MI 48226
Telephone: (313) 961-0200
Facsimile: (313) 961-0388
fherrmann@kerr-russell.com
mpowell@kerr-russell.com

**QUARLES & BRADY LLP**

By: /s/ Rachel A. Graham
Rachel Graham (WI Bar 1069214)
33 East Main Street, Suite 900
Madison, WI 53703
Telephone: (608)283-2419
rachel.graham@quarles.com

Kevin M. Long (WI Bar 1018128)
411 E. Wisconsin Avenue
Milwaukee, WI 53202-4497
Telephone: (414)277-5163
kevin.long@quarles.com

*Counsel for Plaintiff AVL Powertrain Engineering, Inc.*