IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

AVL POWERTRAIN ENGINEERING, INC.,

                              Plaintiff,

    v.

FAIRBANKS MORSE ENGINE, a division of
COLTEC INDUSTRIES, INC.,

                              Defendant.

AMENDED
OPINION AND ORDER

14-cv-877-wmc

---

In August 2008, plaintiff AVL Powertrain Engineering, Inc. ("AVL") entered into a five-year renewable contract with defendant Fairbanks Morse Engine, a division of Coltec Industries, Inc. ("FME"), which called on FME to provide AVL with certain "setup, engineering and support services" for large engine testing at FME's facilities in Beloit, Wisconsin.   In 2014, AVL brought this lawsuit, alleging FME fraudulently induced it into the contract by misrepresenting that FME's facilities were in compliance with environmental regulations, when instead the emissions stacks AVL was directed to use were not covered by the operative emissions permit.   AVL also alleges that FME breached the contract and its implied duty of good faith by impeding and eventually foreclosing AVL's use of FME's facilities for testing.

Before the court is defendant's motion for partial summary judgment seeking dismissal of AVL's claims for rescission based on FME's alleged misrepresentations, as well as AVL's claims for consequential damages.   (Dkt. #14.)   The court will grant summary judgment to defendant on the rescission claims because plaintiff has failed to

advance the necessary proof of a material misrepresentation sufficient for a reasonable jury to find fraud in the inducement.  Even if plaintiff had met that burden, AVL continued testing under the agreement despite FME's noncompliance with the operative emissions permit, thereby affirming the parties' contract even after learning of the alleged misrepresentation.  Defendant is not, however, entitled to summary judgment on plaintiff's claims for consequential damages because the applicable contract provision is ambiguous.  Finally, for reasons stated below, the court will also deny plaintiff's pending motion to strike one of defendant's expert witness reports.  (Dkt. #37.)

## UNDISPUTED FACTS[1]

### I.      Background

Plaintiff AVL is a Michigan corporation with its principal place of business in Plymouth, Michigan.  AVL conducts endurance and environmental emissions testing of large engines, such as those used for heavy construction equipment.  Facilities capable of handling AVL's needs for large engine testing must have a certain amount of space, fixtures, exhaust capability and appropriate environmental permits.

Defendant FME is a Pennsylvania corporation that maintains its principal place of business in Charlotte, North Carolina.[2]  FME operates a complex in Beloit, Wisconsin,

---

[1] Unless otherwise noted, the following facts are undisputed.  The court views all the parties' summary judgment submissions in the light most favorable to AVL as the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989).

[2] Because the parties are completely diverse and the amount in controversy exceeds $75,000, the court has diversity jurisdiction under 28 U.S.C. § 1332.

which had "engine test cells" capable of accommodating AVL's large engine testing during the time period relevant to this lawsuit.

## II.   Air Permit

AVL and FME entered into a contract on August 28, 2008, which states in part that for a term of five years and renewable thereafter:

> FME shall provide to AVL test cell facilities, support services for test cell facilities, test cell operator labor, set up, engineering, testing services and such other services as are mutually agreed upon . . . and set forth and identified in purchase orders . . . submitted to FME by AVL.

(Complaint Ex. A (dkt. #1-1) at 1, 3 (hereinafter "Master Agreement").)  In the Master Agreement, FME expressly represented that it "is, and at all times has been, in material compliance with all applicable environmental laws and regulations."  (*Id.*, Section 12.1, at 8.)

At the time the Master Agreement was signed, FME's Beloit complex had various facilities capable of meeting AVL's testing needs, including the Opposed Piston Building ("OP Building").  Throughout the life of the Master Agreement, FME's Beloit facilities, including the OP Building, were governed by Air Pollution Control Operating Permit No. 154002970-P10 (the "Air Permit").

The Air Permit was originally issued by the Wisconsin Department of Natural Resources ("WDNR") on May 13, 2005.  At all times relevant to this lawsuit, the OP building had nine emission stacks, but the Air Permit explained in a footnote that four of those stacks (the "Subject Stacks") were not incorporated into emissions modeling for the Air Permit:

3

> Four existing stacks (S20C, S21A, S21B and S21C) were not considered in the modeling because they are no longer being used, and are being removed from the facility.  A new stack (S21F) was considered because it is part of the proposed modification.  The limits are set at the maximum emissions rates determined by the computer model to protect the ambient air quality standard for PM emissions.  It was determined that no increments or ambient air quality standards will be violated at these emission rates.

(Decl. of Joseph Eves Ex. A (dkt. #17-1) at 18 n.22 [hereinafter "Air Permit"].)

The parties agree that Stephen Plewa, AVL's Quality Manager and Environmental Health and Safety Manager (Dep. of Stephen Plewa (dkt. #20) at 12:15-22), reviewed the Air Permit before the parties entered into the Master Agreement.  Plaintiff contends, however, that Plewa was not aware of the significance of the footnote regarding the subject stacks at the time AVL entered into the contract.

## III.   WDNR Warning

By June 2011, AVL had already begun using FME's facilities for testing and had spent money building out "test stands" for that purpose.  At least some of AVL's testing around that time took place on test stands eight and ten, which were connected to three of the Subject Stacks (21A, 21B and 20C).

On or around June 15, 2011, a WDNR representative told FME that it should stop using the four Subject Stacks because they were not included in the Air Permit.  In a letter dated June 20, 2011, FME ordered AVL to stop testing engines connected to the Subject Stacks until the permit could be revised to incorporate them.  The letter explained that testing had to cease because "FME has determined that the [Subject] [S]tacks are not described in FME's current Air Pollution Control Operation Permit,

issued by the Wisconsin Department of Natural Resources (WDNR) on May 13, 2005[.]"  (Decl. of Matthew L. Powell Ex. 8 (dkt. #25-9).)[3]  Several days later, FME informed AVL that it could reroute engine test stands connected to Subject Stacks 21A, 21B and 20C to other stacks that were compliant with the Air Permit.  Accordingly, AVL rerouted the test stands and continued testing, although doing so halved the number of test stands AVL could run simultaneously from four to two.

## IV.   Fuel Use Restrictions

In an email sent to AVL dated May 17, 2011, FME's Vice President of Human Resources, John Bottorff, also estimated that the cumulative testing by AVL and FME in the OP Building would exceed FME's permitted monthly fuel amount by July 2011, meaning that AVL would be unable to continue testing for the remainder of the year. (Decl. of Matthew L. Powell Ex. 10 (dkt. #25-11) at 1.)  AVL was allowed to conduct tests in the OP Building until September 2011, when FME shut down further testing consistent with the fuel burn limitation.  (Dep. of John Bottorff (dkt. #33) at 83:3-10.)

After AVL was prohibited from testing in the OP Building, FME allowed AVL to continue testing in its "Large Engine Building."  FME asserts that although the parties intended for the Master Agreement to only permit AVL to test in the OP Building, it permitted AVL to test in the Large Engine Building as an accommodation for the fuel burn limitation.   On the other hand, AVL maintains that the terms of the Master

---

[3] AVL also claims that on June 21, 2011, FME prevented AVL from conducting any testing, including on test stands connected to permitted stacks by shutting off "the water flow to AVL equipment."  (Pl.'s PFOF (dkt. #24) ¶ 8.)  FME denies shutting down all of AVL's testing.

Agreement permitted it to test in the Large Engine Building.  Regardless, the parties agree that AVL spent additional money preparing the Large Engine Building for testing.

AVL asserts that this move was unnecessary because FME's fuel burn estimate for the OP building was "wildly inaccurate," based almost solely on the assumption that FME would itself need to use nearly all of the remaining fuel permitted after September 2011.  (Pl.'s Resp. PFOF (dkt. #22) ¶ 27.)  Contrary to this prediction, however, plaintiff asserts that FME "never came close" to the monthly fuel burn limit under the Air Permit between October 2011 and August 2013, when the initial five-year term contemplated by the Master Agreement expired.  (*Id.*)  Despite this, AVL further asserts that FME never responded to AVL's requests to be notified if it actually used less fuel than anticipated.  (*Id.*)  Had it not been for FME's inaccurate prediction and subsequent failure to notify AVL of the opportunity, AVL argues it could have remained testing in the OP Building in accordance with the fuel usage limitations until at least the end of its initial five-year commitment under the Master Agreement.

Even so, the parties agree that AVL stopped using FME's facilities for testing altogether in October 2012, after FME required AVL to quit testing in the Large Engine Building.  The parties also agree that AVL continued to use office space at FME's Beloit complex to which it was entitled under the Master Agreement until August 2013.  Finally, it is undisputed that AVL never expressly informed FME that it wanted to rescind the Master Agreement after the interruption caused by the WDNR's warning in June 2011.

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this initial burden is met on an issue for which the non-moving party will bear the burden of proof at trial, however, that party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). Moreover, the non-moving party does not satisfy this burden simply by showing "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, it must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A failure to make a sufficient showing would entitle the moving party to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

Here, defendant moves for partial summary judgment on AVL's rescission claims and its claims for consequential damages, which the court addresses in turn. As

explained below, plaintiff's proof falls short of its burden as to the rescission claims, but material factual disputes remain with respect to its claims to consequential damages.

## I.     Rescission Claims

The equitable remedy of rescission is available when a party is induced to assent to a contract by justifiably relying on a fraudulent or material misrepresentation by the other party. *First Nat. Bank and Tr. Co. of Racine v. Notte*, 97 Wis. 2d 207, 222, 293 N.W.2d 530 (1980); *Whipp v. Iverson*, 43 Wis. 2d 166, 171, 168 N.W.2d 201 (1969).[4] When a party to a contract discovers an alleged fraud, however, it has two choices: "affirm the contract and sue for damages, or . . . disaffirm and seek restitution." *Eklund v. Koenig & Assocs., Inc.*, 153 Wis. 2d 374, 380, 451 N.W.2d 150 (Ct. App. 1989). If a party elects to affirm the contract, he may not "later on disaffirm it and ask for rescission." *Beers v. Atlas Assurance Co.*, 231 Wis. 361, 285 N.W. 794, 797 (1939). A party further waives the right to rescission if it "unreasonably delays in asserting that right." *Thompson v. Vill. of Hales Corners*, 115 Wis. 2d 289, 319, 340 N.W.2d 704 (1983). Finally, when the facts regarding the parties' conduct after the alleged fraud comes to light are "practically undisputed," waiver is a question of law appropriately decided at summary judgment. *Weinhagen v. Hayes*, 174 Wis. 233, 178 N.W. 780, 786 (1920); *see also Thompson*, 115 Wis. 2d at 319.

AVL claims that FME misrepresented in Section 12.1 of the Master Agreement that it "is, and at all times has been, in material compliance with all applicable environmental laws and regulations" by using exhaust stacks that were not properly

---

[4] Since both parties assume that the law of Wisconsin applies, so does the court.

permitted during the period between the date the Air Permit went into effect and the date the parties entered into the Master Agreement and failing to remove those stacks from operation. AVL also claims that FME misrepresented in Section 14.1 that work performed pursuant to the Master Agreement "shall be carried out in accordance with all applicable laws, regulations and policies of the United States" by allowing AVL to use the unpermitted stacks. Defendant FME responds that: (1) it made no misrepresentation under Section 12.1 or Section 14.1 regarding its compliance with environmental regulations; and (2) if there was any misrepresentation, then plaintiff AVL's reliance on it was not justified. Defendant further argues that even if plaintiff could establish the elements entitling AVL to rescission, by continuing to perform under the Master Agreement after discovering the alleged misrepresentation, AVL affirmed the agreement and effectively waived its right to rescission.

### A. Claimed Misrepresentations

As an initial matter, there is substantial question as to whether FME made *any* misrepresentation on this record, since at the time the parties entered into the agreement, FME was not out-of-compliance with its permit. Indeed, as FME points out, AVL's claimed harm stems primarily from the WDNR's warning about the actual *use* of the subject stacks, which FME claims began in the spring of 2011 (Def.'s Resp. PFOF (dkt. #47) ¶ 7), almost three years after the parties entered into their contract, while there is no evidence on this record of *any* violation of the Air Permit at the time the parties entered into the Master Agreement. *Compare Tam v. Luk*, 154 Wis. 2d 282, 287-89, 453 N.W.2d 158 (Ct. App. 1990) (holding that "there must be some showing of

9

prejudice, damage or detriment" to establish claim for rescission), *with* Restatement (Second) of Contracts § 164 cmt. c ("[T]he recipient of a misrepresentation need not show that he has actually been harmed by relying on it in order to avoid the contract."); *see also Notte*, 97 Wis. 2d at 222 (adopting Restatement approach to law on rescission in Wisconsin).

Under Wisconsin law, "if a party to a contract is induced to manifest his assent to the contract by a means of a fraudulent or material misrepresentation by another party to the contract, the contract is voidable if the recipient justifiably relies on the misrepresentation." *Notte*, 97 Wis. 2d at 209. Plaintiff first claims that FME made a material misrepresentation by expressing in Section 12.1 of the Master Agreement that it "is, and at all times has been, in material compliance with all applicable environmental laws and regulations." AVL argues that FME's representation in Section 12.1 was false at the time the parties entered into the Master Agreement because two witnesses testified at their depositions that -- contrary to the representation in the Air Permit -- FME may have used some of the Subject Stacks between the date that the Air Permit went into effect and the date the parties entered into the Master Agreement.

At the outset, AVL does not explain why that alleged representation was material. Perhaps AVL's intended fraud claim is that FME misled it into believing at the very outset of their agreement that all of the exhaust stacks contemplated for use during onsite testing were permitted, and that but for that misrepresentation AVL would not have proceeded to contract. However, that is *not* what the contract represents, and the contract normally controls, at least if, as here, it has a strong integration clause

10

disavowing prior understandings and representations. *See Town Bank v. City Real Estate Dev.*, LLC, 2010 WI 134, ¶ 39, 330 Wis. 2d 340, 793 N.W.2d 476 (2010) ("[W]hen the contract contains an unambiguous merger or integration clause, the court is barred from considering evidence of any prior or contemporaneous understandings or agreements between the parties, even as to the issue of integration.").

In any event, FME disputes whether the Subject Stacks were actually used during that time period. And even assuming that they were, no reasonable jury could find that alleged misrepresentation was material. A misrepresentation is material when "it is likely to induce a reasonable person to manifest his assent by the misrepresentation." *Notte*, 97 Wis. 2d at 223. AVL makes no showing, nor could any reasonable jury find, that any misrepresentation about whether FME used the Subject Stacks before the Master Agreement went into effect was likely to induce an objectively reasonable person to assent to the agreement. Indeed, contrary to FME's assertion, AVL maintains that the Master Agreement did *not* limit it to testing on any particular emissions stacks or in any particular building of FME's complex. Moreover, AVL proposes no facts suggesting that the parties had any understanding about which emissions stacks were allotted for AVL's use at the time the parties entered into the Master Agreement. [5]

Certainly, AVL points to no provision in the Master Agreement -- which after all includes a fairly comprehensive integration clause at section 19.3 -- indicating that the parties had agreed to AVL using any particular emissions stacks or buildings at FME's

---

[5]   Ultimately, the court need not resolve the issue regarding AVL's intended fraud in the inducement claim since the claim fails in any event by virtue of AVL's subsequent affirmance of altered terms. *See infra*, part I(B).

complex, a subject about which the parties could have easily contracted. *Cf. Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 45, 283 Wis. 2d 555, 699 N.W.2d 205 (permitting limited fraud in the inducement exception to economic loss doctrine when the intentional misrepresentation is extraneous to, not interwoven with, the contract because "the alleged misrepresentation concerned a matter whose risk was never contemplated to be part of the contract[,] . . . . [was] not a matter that was dealt with in the contract, nor would one expect it to be dealt with in the contract."). Accordingly, since AVL claims it was entitled to unfettered use of the other stacks, any misrepresentations FME made regarding its use of any unpermitted stacks before the Master Agreement could not have been reasonably relied upon in assenting to the Master Agreement.[6] *See Ritchie v. Clapper*, 109 Wis. 2d 399, 406, 326 N.W.2d 131 (Ct. App. 1982) ("If the facts are undisputed, whether the party claiming fraud was justified in relying on a misrepresentation is a question of law.") (citing *Williams v. Rank & Son Buick, Inc.*, 44 Wis. 2d 239, 246-47, 170 N.W.2d 807, 811 (1969)).

AVL further claims that the representation in Section 12.1 was false because FME did not physically remove the Subject Stacks from its facility despite the footnote in the Air Permit stating that the Subject Stacks "are no longer being used, and are being removed from the facility." Even crediting AVL's interpretation of the footnote as contemplating physical removal of the Subject Stacks, rather than their removal from

---

[6] Nor does AVL make any showing under a subjective standard that there were special circumstances that would induce it to contract because of the alleged misrepresentation. *See Notte*, 97 Wis. 2d at 223 (a misrepresentation that is not objectively material may be subjectively material if there are "personal considerations which would induce the recipient to enter the contract" and the party making the misrepresentation knows about those considerations).

operation, no reasonable jury could find that Section 12.1 was a material misrepresentation with respect to the physical status of the Subject Stacks, since again, AVL has not shown that the parties anticipated or reached any agreement that AVL would use any particular emissions stacks for testing and claims that the Master Agreement did not limit it to testing on any particular emissions stacks in FME's facilities.[7]

AVL also points to another provision of the Master Agreement, Section 14.1, which provides that "[t]he parties hereto agree that all activities and work performed, directly or indirectly, pursuant to this Agreement, or in furtherance of its objectives, shall be carried out in accordance with all applicable laws, regulations and policies of the United States."  The general rule is that a misrepresentation must concern facts that exist at the time the party made a statement.  *See Notte*, 97 Wis. 2d at 222; *Schurmann v. Neau*, 2001 WI App 4, ¶ 10, 240 Wis. 2d 719, 624 N.W.2d 157 ("[U]nless the speaker knew of facts inconsistent with his statements or had a present intent not to perform, an action for misrepresentation cannot be based on future events or facts not in existence when the representation was made, or on unfulfilled promises.").  There is, however, an exception

---

[7] Even if AVL could show that it relied on a misrepresentation that the Subject Stacks were physically removed, such reliance would not appear to be justifiable.  AVL concedes that its Environmental Health and Safety Manager, Stephen Plewa, reviewed the permit before the parties entered into the Master Agreement, and although AVL contends that it did not fully appreciate the significance of the footnote in the Master Agreement, it was seemingly a sophisticated party receiving an easily ascertainable fact.  *See Williams*, 44 Wis. 2d at 246 ("Whether the falsity of the statement could have been determined through ordinary care is to be determined in light of the intelligence and experience of the misled individual."); *Jacobsen v. Whitely*, 138 Wis. 434, 437, 120 N.W. 285 (1909) ("[C]ourts will refuse to act for the relief of one claiming to have been misled by another's statements who blindly acts in disregard of knowledge of their falsity or with such opportunity that by the exercise of ordinary observation, he would have known.  He may not close his eyes to what is obviously discoverable by him[.]").

to the pre-existing fact rule when the party that makes the statement "has a present intention not to perform" or "is aware of present facts incompatible with that [statement]." *Hartwig v. Bitter*, 29 Wis. 2d 653, 658, 139 N.W.2d 644 (1966); *see also* Restatement (Second) of Contracts § 159 cmt. c ("[A] promise or prediction of future events may by implication involve an assertion that facts exist from which the promised or predicted consequences will follow, which may be a misrepresentation as to those facts."). Even assuming that a representation regarding "all applicable laws, regulations and policies of the United States" in Section 14.1 of the Master Agreement could encompass the use of exhaust stacks not included in modeling for the Air Permit, plaintiff offers no evidence that FME had any intent to violate the Air Permit by allowing AVL to use the Subject Stacks for testing *at the time* the parties entered into the Master Agreement. Because Section 14.1 does not concern a pre-existing fact, it obviously cannot constitute the basis for a misrepresentation entitling AVL to rescission.

Finally, AVL argues that FME's failure to disclose that AVL could not use the Subject Stacks was a voidable misrepresentation that FME was in compliance with the operative environmental permit. A party's failure to disclose a fact can be equivalent to a representation of the non-existence of that fact, but only if that party has a duty to disclose that fact. *See Ollerman v. O'Rourke Co., Inc.*, 94 Wis. 2d 17, 26, 288 N.W.2d 95 (1980); *Southard v. Occidental Life Ins. Co.*, 31 Wis. 2d 351, 359, 142 N.W.2d 844 (1966) ("One who fails to disclose to another a thing which he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter which he has

14

failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.") (internal quotation marks and citation omitted). AVL cannot show that FME had a duty to disclose the permitting status of the Subject Stacks because, as already discussed, AVL has not shown that the parties had any agreement about what particular exhaust stacks would be allocated to AVL for testing, and AVL insists that the Master Agreement permitted it to use any of FME's facilities for testing.[8]   For these reasons, AVL cannot establish the elements of a rescission claim based on any misrepresentation made by FME.

## B.  Affirmance of Contract

Even assuming a fraud in the inducement could be found by a reasonable jury on this limited record, plaintiff's rescissionary claims also fail because AVL affirmed the contract after learning of FME's arguable noncompliance with the Air Permit by continuing to test onsite for a full year more and otherwise performing under the contract for two years before suing to rescind.  Less than a week after the WDNR admonished FME to stop all engine testing on the Subject Stacks on June 15, 2011, the parties agree that FME sent a letter to AVL ordering it to cease all testing on engines connected to those stacks until it could obtain a revision of the Air Permit bringing the stacks into compliance.   Several days after sending that letter, FME further informed AVL that it could test engines using other permitted stacks in the OP Building.  Despite claiming that

---

[8] Furthermore, as already discussed, AVL was aware of the permitting status of the Subject Stacks because its Environmental Health and Safety Manager reviewed the footnote in the Air Permit. Therefore, any reliance on a representation from FME that the Subject Stacks were included in the modeling for the Air Permit would appear not to be justifiable.

option *halved* the amount of testing it could conduct, AVL accepted FME's proposal and did just that, albeit on a limited basis.

In particular, AVL admits that it not only continued testing in the OP Building until September 2011, when FME prevented AVL from further testing due to its own claimed needs, but then moved an engine from the OP Building to the Large Engine Building to continue testing onsite.  AVL further spent money building out another test cell at that building.  According to AVL, FME did not stop AVL from conducting any further testing because of the fuel burn limitation until October 2012.  Even then, AVL concedes that it maintained an office at FME's facilities until August 2013 consistent with the parties' written agreement, while continuing to test elsewhere.

In response, plaintiff rightly points out that "mere delay" in voiding a contract after discovering fraud does not amount to waiver of a claim for rescission.  *Weinhagen*, 178 N.W. at 787.  Fair enough, but persisting in efforts to test engines using FME's facilities until *FME* terminated the parties' testing arrangement in October 2012 -- more than sixteen months after learning that the subject stacks were not included in the Air Permit -- is simply far too late for AVL reasonably to seek to return the parties to the positions in which they stood before the Master Agreement.[9]  *See Thompson*, 115 Wis. 2d at 319 ("A party's right to rescind for fraud or mistake is waived if he unreasonably delays in asserting that right or affirms the agreement after learning of the fraud or mistake giving rise to the right of rescission.").

_____

[9] This is particularly true given that AVL attributes bad faith to FME in allegedly trying to block its testing by shutting off water needed to run its equipment and making intentionally inaccurate fuel burn predictions, as well as ignoring AVL's requests to be updated on the parties' actual fuel usage.

Plaintiff makes three additional arguments disclaiming waiver.  First, plaintiff also argues that its actions after defendant's claimed breach in June 2011 did not affirm the contract because AVL only attempted to mitigate its damages.   Second, although admitting that it never expressly stated an intent to rescind the contract, plaintiff argues that it nevertheless manifested a clear intent not to waive its right to rescission.  Finally, plaintiff argues it did not waive rescission because FME's actions placed it in a position in which rescinding the contract soon after the breach would have been impracticable.

Although plaintiff cites some case law in support of the latter two arguments, it cites *no* authority to support its argument that AVL's efforts to continue testing after June 2011 did not affirm the contract since testing was only an effort to mitigate the harm caused by FME's breach.[10]   Lacking citation to any case law or other authority, plaintiff sets forth its reasoning in a single paragraph:

> AVL has the right to advance multiple theories by pleading alternative causes of action for recovery/remedies; therefore, in order to preserve any contract claim AVL had to attempt mitigation (*because if it ultimately could not achieve rescission, it would not want to be in the position of also losing its contract breach claim for want of mitigation*).  In other words, the courts should not strip a party of one theory of recovery because it attempted mitigation to sustain another.

(Pl.'s Opp'n Br. (dkt. #23) at 18-19 (emphasis added).)

Certainly, the remedies for breach of contract and rescission are "alternative," but that is because the theories underlying each remedy are "wholly inconsistent."  *Beers*, 285 N.W. at 797; *see also Harley-Davidson Motor Co. v. PowerSports, Inc.*, 319 F.3d 973, 988

---

[10] Plaintiff does cite one case -- *International Production Specialists, Inc. v. Schwing America, Inc.*, 580 F.3d 587 (7th Cir. 2009) -- to introduce the "general concept" of mitigation of damages, but that case is in the context of a breach of contract claim.  *See id.* at 598.

(7th Cir. 2003) (collecting cases).  On one hand, when a party chooses to rescind a contract fraudulently induced, it is void.  "The effect . . . is to restore the parties to the position they would have occupied had no contract ever been made." *Schnuth v. Harrison*, 44 Wis. 2d 326, 339, 171 N.W.2d 370 (1969).  Accordingly, rescission is an equitable remedy, and damages are restitutionary.  *See Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 36, 270 Wis. 2d 146, 677 N.W.2d 233.

On the other hand, "[t]hat a plaintiff must do all that is reasonable to minimize damages after a . . . breach of contract has occurred is well established." *O'Brien v. Isaacs*, 17 Wis. 2d 261, 267, 116 N.W.2d 246 (1962).  Traditional damages for breach of contract seek to put the other party in the position in which it would have been had the contract been fully performed.  *See e.g., Schubert v. Midwest Broadcasting Co.*, 1 Wis. 2d 497, 502, 85 N.W.2d 449 (1957).[11]

In fairness, there is some authority to support the proposition that a party's *limited* efforts to mitigate damages do not necessarily constitute a waiver of rescission remedies under certain circumstances.  *Compare Banque Arabe Et Internationale D'Investissement v. Md. Nat'l Bank*, 850 F. Supp. 1199, 1215 (S.D.N.Y. 1994) (holding bank did not reaffirm contract when it accepted foreclosure payments after commencing a suit for rescission, concluding that money collected would be credited against any damages

---

[11] Plaintiff's attempt to justify its efforts to mitigate by claiming concern with pleading multiple theories of recovery is unfounded.  "A party found to have waived a right to rescission because of delay may still assert a claim for breach-of-contract damages." *Grube v. Daun*, 213 Wis. 2d 533, 550-53, 570 N.W.2d 851 (1997).  "If a party brings a rescission action that proves unsuccessful and the contract is upheld, the contract and all of the parties' rights and obligations, including the right to claim damages for breach, remain." *Bischoff v. Hustisford State Bank*, 195 Wis. 312, 320-21, 218 N.W. 353 (1928).

awarded at trial), *with Beech Aircraft Corp. v. Flexible Tubing Corp.*, 270 F. Supp. 548, 563-64 (D. Conn. 1967) (holding that the plaintiff's use of goods after providing notice of rescission was not reasonably necessary to mitigate damages and constituted a waiver when evidence did not show that "great damages would surely occur to the buyer if it did not use those [goods]").

Where, as here however, a party claims that it was induced into a contract by a misrepresentation and the facts show the party endeavored to operate under the terms of the contract for sixteen months until the other party finally stopped its efforts to perform, the only reasonable conclusion is that the party has acted to affirm the contract and has waived its right to rescission. *See Grube v. Daun*, 213 Wis. 2d 533, 551-52, 570 N.W.2d 851 (1997) (making multiple improvements to property more than twelve months after discovering mutual mistake and not abandoning property until four years later affirmed contract); *Thompson*, 115 Wis. 2d at 319 ("Thompson's failure to assert his rights for more than six months together with his affirmance of the lease . . . constitute a waiver of any right to rescind."); *see also U.S. Plastic Lumber, Ltd. v. Strandex Corp.*, No. 02-C-211-C, 2003 WL 23144861, at *7 (W.D. Wis. Feb. 7, 2003) ("The 18-month delay [in filing suit] by itself is enough to deny plaintiffs the remedy of rescission."). In light of the wealth of case law underscoring the incompatibility of the theories underlying remedies for rescission and breach, along with plaintiff's failure to demonstrate that courts have applied mitigation principles to find that a party's actions in affirmance of a contract do not waive its right to rescind the contract, the court cannot hold that AVL

did not affirm the contract because its efforts to continue testing were only an attempt to mitigate damages.

With respect to plaintiff's remaining arguments, the cases AVL cites in support are inapposite.  In *Smith v. Adcock*, 142 Wis. 2d 937, 417 N.W.2d 197 (1987), for example, a party was found not to waive a claim for rescission when it clearly expressed its intention not to affirm the contract.  *See id*. at *2.  In contrast to AVL, however, the plaintiff in *Adcock* (1) "expressed her extreme displeasure," (2) told the defendant that she did not want to spend any more money under their agreement, (3) offered to sell her interest under the agreement to the defendant, and (4) threatened to hire an attorney.  *Id.*

Indeed, there is nothing in this record to suggest that AVL took *any* affirmative steps to stop testing at FME's facilities after learning of alleged fraud in the inducement. Instead, AVL actually made multiple efforts to *increase* testing after June 2011, even in the face of alleged bad faith obstruction by FME.

The other cases plaintiff cites center around the general principle expressed in *Weinhagen* that "[a]n inference of intent to waive does not readily arise, where the situation in which the party required to elect finds himself is the result of the opposite party's fraud or misconduct."  178 N.W. at 787.  The defrauded parties in Weinhagen and AVL are similar in the sense that both discovered alleged fraud only after years had passed from signing their agreement, and after both had spent a significant amount of money to fulfill their side of the bargain.  *Id.* at 786.  Similar to the critical distinction between AVL and the plaintiff in *Adcock*, however, the defrauded parties in *Weinhagen* "did nothing [in the three or four months after discovery of the fraud until claiming

20

rescission] which indicated in any positive way that they had determined upon the one course or the other." *Id.* at 786-87. In contrast to the defrauded parties in *Adcock* and *Weinhagen*, AVL's actions affirming the parties' Master Agreement truly stand out.

Even *Havoco of America, Inc. v. Hilco, Inc.*, 799 F.2d 349 (7th Cir. 1986), does not reach as broadly as plaintiff contends. In *Havoco*, the Seventh Circuit declined to "apply the principle of waiver by affirmance when attempted rescission would be impracticable or cause further injury." *Id.* at 353 (applying Illinois law).[12] Critically, the Seventh Circuit did not apply that principle to the plaintiff in *Havoco*, but rather reversed the district court's grant of summary judgment to the defendant, emphasizing that "an essential element of waiver is that the injured party intended to affirm the contract" and concluding that the record did not contain sufficient evidence of the plaintiff's intention to waive claims based on fraud. *Id.* at 354. Accordingly, the court finds *Havoco* inapposite factually and legally, and credits defendant's argument that rescinding the contract would have been injurious or impracticable.

After learning that the subject stacks were not included in modeling for the Air Permit, and as a result, being ordered to stop testing, AVL resumed testing on a limited basis in the original building FME had designated for testing and then continued to do further testing at FME's alternative facilities, including sinking more money into the endeavor. In doing so, a reasonable trier of fact would have to conclude that AVL elected to affirm the contract, and seek to profit from, or at least mitigate damages flowing from a breach of, the Master Agreement, rather than void the contract and seek damages based

[12] As defendant points out, the language concerning the impracticability of attempted rescission from *Havoco* appears not to have been cited by any court applying *Wisconsin* law.

21

on restoring the parties to the positions they occupied before contracting. Having demonstrated its unambiguous intent to affirm the contract by its actions after learning of the alleged fraud, AVL has effectively waived its rescission claims. Accordingly, defendant is entitled to summary judgment on those claims.

## II.     Claims for Consequential Damages

Defendant also moves for partial summary judgment on plaintiff's claim to consequential damages, on the basis that the parties agreed to preclude such damages under the last two sentences of Section 11.1 of the Master Agreement.[13]   Plaintiff disagrees with this interpretation, arguing that Section 11.1 only limits FME's liability related to *third party* claims. As the language of Section 11.1 is ambiguous on this point, summary judgment will be denied.

Section 11.1 of the Master Agreement, entitled "Indemnification and Hold Harmless," states in relevant part that:

> FME shall indemnify, defense and hold harmless AVL, its customers, affiliates, subsidiaries, officers, directors, agents and employees from and against all losses, costs, damages and expenses, including reasonable attorney and expert fees (hereinafter "Losses), arising out of or connected with
>
> (a) any actual or alleged breach by FME of any term, condition, warranty or covenant set forth in this Agreement;
>
> (b) any claim alleging the infringement of any third party's patent, trademark, copyright or other rights arising out of any activities undertaken pursuant to this Agreement;

---

[13] Although AVL's complaint did not specifically request consequential damages, it does seek "lost profits, lost or impaired customer relationships and expectancies, unrecoverable investment, damage to its reputation, incidental costs associated with the Agreement, and other amounts recoverable under the Agreement." (Master Agreement (dkt. #1-1) ¶¶ 48, 55.)

(c) any actual or alleged death or injury to any person …

(d) from any claims by any Fairbanks employees or representatives or any claims arising ou[t] of any acts of the employees or representatives of FME, or

(e) any damages or loss caused to any AVL equipment or machinery or the equipment, machinery or products of any AVL customer that is located at the Test Facilities and which is caused by the actions of FME or any employees, agents, representatives or subcontractors of FME.

For purposes of this Section 11.1 only, and except for any Losses arising from claims [alleging infringement of a third party patent, trademark, or copyright] referenced under Section 11.1(b) of this Agreement, **under no circumstances shall FME be liable for any Losses in excess of the value of Services provided hereunder.  Under no circumstances shall FME be liable for claims of special, indirect or consequential damages.**

(Master Agreement (dkt. #1-1) 8)) (emphasis added).  The question before the court is thus whether Section 11.1 the Master Agreement:  (1) caps AVL's damages to the value of Services; and (2) precludes AVL from claiming consequential damages in a breach of contract claim against FME.

When Wisconsin courts are called upon to interpret a contract, "[t]he objective . . . is to ascertain the true intention of the parties."  *Kraemer Bros., Inc. v. U.S. Fire Ins. Co.*, 89 Wis. 2d 555, 562 278 N.W.2d 857 (1979).  In doing so, the court considers the plain language of the contract. *First Bank* & *Tr. v. Firstar Info. Servs., Corp.*, 276 F.3d 317, 322 (7th Cir. 2001) (citing *Bank of Barron v. Gieseke*, 169 Wis. 2d 437, 485 N.W.2d 426, 432 (1992)).  Additionally, the court construes the meaning of contract provisions in the

23

context of the entire contract as a whole.  *Tempelis v. Aetna Cas. & Sur. Co.*, 169 Wis. 2d 1, 9, 485 N.W.2d 217, 220 (1992).

In Wisconsin, it is a question of law whether a contract is ambiguous, meaning that "its terms are reasonably or fairly susceptible of more than one construction." *Borchardt v. Wilk*, 156 Wis. 2d 420, 427, 456 N.W.2d 653 (1990).  Summary judgment is not appropriate if "the contract is ambiguous and the intent of the parties to the contract is in dispute."  *Energy Complexes, Inc. v. Eau Claire Cty.*, 152 Wis. 2d 453, 466-67, 449 N.W.2d 35 (1989).  Contractual language is ambiguous only when its terms are "reasonably or fairly susceptible of more than one construction."  *Borchardt*, 156 Wis. 2d 420, 427, 456 N.W.2d 653.

Defendant contends that the terms "indemnify" and "hold harmless" are not limited to claims for indemnification on third party claims.  Then it contends that the plain meaning of Section 11.1 is that FME can never be held liable for consequential damages related to any claim arising from the Master Agreement, including claims brought by AVL.  It points in particular to the final two sentences that state that "under no circumstances" may FME be held liable for losses in excess of services or for consequential damages.  Yet defendant's position does not take the entire contract into account.

Section 11.1 is susceptible to two readings regarding whether it applies only to third party claims.  As a starting point, the parties dispute whether the language in Section 11.1 -- that FME shall "indemnify, defend and hold harmless AVL -- limits that section to third party claims.  Citing to one Wisconsin decision, plaintiff claims that the

indemnification provision only operates to limit FME's liability arising from third party claims. *See Bus. Park Dev. Co. v. Molecular Biology Res., Inc.*, 2004 WI App 167, ¶ 20, 276 Wis. 2d 310, 686 N.W.2d 456 (applying the 1999 version of Black's Law Dictionary to find that "the term 'indemnify' contemplates damages incurred in connection with a third-party action").

Defendant responds that the decision in *Business Park* not only lacks precedential value, but that it applied an outdated definition of indemnify, citing to a more recent Eastern District of New York case. *Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC*, 549 F. Supp. 2d 249 (E.D.N.Y. 2008). The *Bobrow* court was actually applying Wisconsin law and rejected *Business Park*, concluding that based on the definitions in the 2004 Black's Law Dictionary and the Merriam-Webster's Dictionary, indemnify means "to make payment to another for damage incurred, whether by the fault of the paying party or a third party." *Id.* at 272. The court thus held that a contract provision guaranteeing that the indemnitor would "hold harmless and indemnify" the other party to the contract allowed that other party to prevail on its counterclaim for costs and attorney fees against the indemnitor in an action strictly between the two parties to the contract.

Neither of these decisions is persuasive because each relied upon a close reading of the language in the particular contract at issue in each case, neither of which included the precise "indemnify, defend and hold harmless" language from Section 11.1. Further, defendant's citation to *Bobrow* is distinguishable because the party seeking relief was trying to get reimbursed for fees and costs incurred in another action, and that court held the party was entitled to seek recovery because it was clear that the indemnification

provision was "intended to absolve [that party] from any *liability* for expenses incurred in connection with threatened or actual litigation arising from the Agreement." *Id.* at 273 (emphasis added).

Here, in contrast, FME, as the indemnitor, argues that Section 11.1 should be interpreted to absolve *its own* liability -- not the indemnitee's -- for consequential damages arising out of a claim that FME breached the Master Agreement.   Additionally, in contrast to *Bobrow*, at least one other court has interpreted an indemnification provision containing the words "indemnify," "defend" and "hold harmless" to encompass only third party claims.   *See Travelers Indem. Co. v. Dammann* & *Co.*, 594 F.3d 238, 255 (3d Cir. 2010) (observing that it would render the term "defend" meaningless to find that an indemnitor could "defend" the indemnitee from itself).   In the end, it is not apparent that the words "indemnify, defend and hold harmless" limit Section 11.1 to third party claims.

Moreover, viewing other terms in the Master Agreement in conjunction with Section 11.1 leads the court to conclude that the specific applicability of the last two sentences of Section 11.1 are ambiguous in the context of the contract as a whole.   For example, Section 11.2 of the Master Agreement immediately following Section 11.1 also falls under the general heading of "Indemnification and Hold Harmless," and it provides:

> Each party shall notify the other of any claim, recall or lawsuit relating to the Services ("Claims").   In the event of any Claims hereunder, AVL shall accept liability for any damages or injuries as specified in article 11.1, but AVL shall accept no liability on behalf of FME, which will in its own discretion be responsible for the defense of such Claims, provided, however, that if FME fails to adequately defend such Claims, AVL shall have the right, at its sole option, to assume the defense, and FME shall remain

26

obligated to indemnify AVL hereunder.  FME is not authorized to settle or compromise any such Claims without prior written consent of AVL.

Section 11.2 does not distinguish between first party claims and third party claims with respect to the obligation of each party to notify the other party of any Claim, which could reasonably be interpreted to mean that Section 11.1-type claims always involve third parties.  *Compare Hooper Assocs., Ltd. v. AGS Computs., Inc.*, 74 N.Y.2d 487, 492-93, 548 N.E.2d 903 (N.Y. 1989) ("To extend the indemnification clause to require defendant to reimburse plaintiff for attorney's fees in the breach of contract action against defendant would render these provisions meaningless because the requirement of notice and assumption of the defense has no logical application to a suit between the parties."), *with Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 651 (S.D.N.Y. 1999) ("In the instant case, unlike *Hooper*, the notice requirement and assumption of defense provisions are expressly limited to third-party claims as opposed to 'any claim to which the indemnity set forth in sub-paragraph (a) applies.'").

Further, Section 2.5 of the Master Agreement could be read to be meaningless if Section 11.1 applies to both first party and third party claims.  Section 2.5 provides:

> FME agrees that FME shall be liable for and shall reimburse AVL for any damages or loss caused to (i) any AVL equipment or machinery located at the Test Facilities, or (ii) any equipment, machinery or products of any AVL customer that is located at the Test Facilities, which is caused directly by the negligent actions of FME or any employees, agents or representatives of FME.

Applying Section 11.1, which, like Section 2.5, encompasses losses "arising out of . . . any damage or loss caused to any AVL equipment or machinery or the equipment, machinery or products of any AVL customer that is located at the Test Facilities and which is caused

27

by the actions of FME or any employees, agents, representatives or subcontractors of FME," to first party claims would appear to render Section 2.5 of the Master Agreement "mere surplusage." *Md. Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶ 45, 326 Wis. 2d 300, 786 N.W.2d 15 (citation omitted).  Given that Section 2.5 provides for FME to be directly liable for similar, if not the same, claims related to AVL equipment described in subsection (e) of Section 11.1, it is unclear whether the parties intended for Section 11.1 to govern first party claims.  S*ee Carey v. Rathman*, 55 Wis. 2d 732, 737, 200 N.W.2d 591 (1972) ("The general rule of interpretation of a contract is to determine the intent from the instrument as a whole and not necessarily from isolated or particular parts thereof.").

Finally, the arguments defendant offers for interpreting the indemnification provision to apply to first party, as well as third party claims, do not establish that Section 11.1 is unambiguous.  First, defendant argues that the list of claims and damages provided in Section 11.1 was intended to be exhaustive and included direct claims between AVL and FME, arguing in particular that in addition to third party claims for personal injury and property damage, Section 11.1 (a) and (e) both refer to direct claims for breach of contract and damage to machinery.  Subsections (a) and (e), however, could also be fairly read to describe third party claims, since Section 11.1 encompasses losses "arising out of or connected with" FME's breach or damage to AVL's equipment.

Second, defendant argues that interpreting subsection (a) to apply only to third party claims would render subsection (c) mere surplusage, since that subsection includes any "damage or loss, by whomever suffered, which is claimed to have resulted in whole or in

part from any activities undertaken pursuant to this Agreement."  (Master Agreement (dkt. #1-1) at 7.)  On the contrary, while subsection (c) overlaps with subsection (a), subsection (c) appears to encompass claims that could be brought in the absence of any breach of the Master Agreement by FME.  Accordingly, adopting plaintiff's interpretation of subsection (a) would not necessarily render subsection (c) mere surplusage.

Defendant also argues, without support, that the consequential damages limitation "makes little sense in the context of indemnification for a third party claim." (Def.'s Reply Br. (dkt. #44) at 11).  Yet it would be reasonable for an indemnitee (such as AVL) to waive liability for consequential damages arising from third party claims, since the indemnitee could presumably contract with the third party to limit consequential damages.  Thus, Section 11.1 of the Master Agreement does not unambiguously limit the availability of consequential damages, which is fatal to defendant's request for summary judgment.[14]  Accordingly, the sole question for the jury is whether Section 11.1 applies only to third party claims and not to first party claims between the parties themselves.

---

[14] Plaintiff further compares Section 12.3 to Section 11.1, arguing that it is limited to third party claims as well.  Section 12.3 provides that FME "shall indemnify, defend and hold harmless AVL" for losses "arising out of, connected with, or in any way related to any violations of any environmental laws at the Test Facilities."  This section also provides that the "limitation set forth in Section 11 shall not apply to the indemnity obligations of FME set forth in this Section 12."  In plaintiff's view, this section permits AVL to seek damages against FME *only* for third party claims and thus limits AVL's ability to bring claims just as Section 11.1 limits FME's ability to limit damages to third party claims.  Although plaintiff notes the *similarity* in language between the two sections, this argument amounts to little more than conjecture about the meaning of Section 11.1.  Plaintiff adds in a footnote that Section 11.1 would not apply to its fraudulent inducement claims based on FME's misrepresentations related to environmental compliance.  Although plaintiff does not go as far as claiming that Section 12.3 applies to its fraudulent inducement claim, that argument is a non-starter because, as already explained, there was no actionable misrepresentation.

### III.    Motion to Strike

Lastly, AVL moves to strike the expert report submitted by Clayton Raasch, P.E., one of FME's experts (the "Raasch report").  In its opening brief in support of the motion to strike, plaintiff argues that the Raasch report is untimely because plaintiffs disclosed it on the deadline for "respondent experts" rather than the deadline for "proponent experts," even though his report only addresses issues that were not raised by plaintiff's only expert, who opined about damages.  In response, defendant argues that whether an expert is designated a proponent expert or a respondent expert turns on which party bears the burden of persuasion on a particular issue.

The court agrees with defendant that an expert offering opinions on a particular issue is properly designated a proponent expert or a rebuttal expert, depending on which party bears the burden of persuasion on that issue.  In other words, it is permissible for a party to offer a respondent expert for issues on which the opposing party did not have a proponent expert opine, provided that the latter party ultimately bears the burden of persuasion on those issues.

A proponent bearing the burden of persuasion on an issue who decides not to offer expert opinion runs the risk that the respondent will present expert testimony on that same issue.[15]  Contrary to plaintiff's contention that Raasch should have been designated

---

[15] As Magistrate Judge Crocker explained in a text order in *United States v. Spectrum Brands, Inc.*, 15-cv-371-wmc, a "proponent has no right to demand that the respondent go first, then determine if the proponent wishes to respond because this would turn the court's procedure on its head."  (Dkt. #18.)

a proponent expert because several opinions in the Raasch report could only be relevant to support an affirmative defense made by FME, the opinions detailed in the report appear to be responsive to plaintiff's bad faith and breach of contract claims. Accordingly, defendant disclosed the Raasch report timely, and plaintiff's motion to strike will be denied.  That said, the court will take up plaintiff's motion *in limine* to exclude the opinions expressed in the Raasch report from being presented at trial in a separate order.

ORDER

IT IS ORDERED that:

1) Defendant's motion for partial summary judgment (dkt. #14) is GRANTED IN PART AND DENIED IN PART, consistent with this opinion; and

2) Plaintiff's motion to strike (dkt. #37) is DENIED.

Entered this 15th day of April, 2016.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge